IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>vs.<br><br>DONTAVIUS SHARKEY,<br>Defendant. | ) | CASE NO. 4:22-CR-00176-SMR-HCA-1<br><br>**MOTION TO DISMISS COUNTS 1 AND 3 ON CONSTITUTIONAL GROUNDS** |

**COMES NOW** the Defendant, Dontavius Sharkey ("Sharkey"), by and through counsel, and pursuant to Fed. R. Crim. P. 12, respectfully requests that the Court dismiss Counts 1 and 3 of the Indictment as facially unconstitutional under the Second Amendment to the United States Constitution and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 213 L. Ed. 2d 387, 142 S. Ct. 2111 (2022). Further, Sharkey prays, in the alternative, that the Court dismiss Count 1 as unconstitutional as applied to him. In support, the following is stated:

## BACKGROUND

Sharkey is a felon as defined by federal statute. On 11/15/2022, he was indicted for Count 1 (Felon in Possession of a Firearm) in violation of 18 U.S.C. § 922(g)(1), Count 2 (Illegal Possession of a Machinegun) in violation of 18 U.S.C. § 922(o), and Count 3 (Possession of a Firearm with Obliterated Serial Number) in violation of 18 U.S.C. § 922(k). Sharkey entered pleas of not guilty and denied forfeiture on 11/28/2022.

## ARGUMENT

### I. The *Bruen* framework.

A modern firearm regulation's constitutionality depends only on the Second Amendment's text and historical understanding. The Second Amendment's operative clause — "the right of the people to keep and bear Arms shall not be infringed" — protects an individual's right to carry a

firearm in and outside the home for self-defense. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 213 L. Ed. 2d 387, 142 S. Ct. 2111, 2122 (2022). Under the *Bruen* framework, "when the Second Amendment's plain text covers an individual's *conduct*, the Constitution presumptively protects that *conduct*." *Id.* at 2126 (emphasis added). The Government then "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Only then may a court conclude that the individual's *conduct* falls outside of the Second Amendment's "unqualified command." *Id.* (citation omitted). "To justify its regulation, the government may not simply posit that the regulation promotes an important interest." *Id.*

## II. 18 U.S.C. § 922(g)(1) is facially unconstitutional because firearm possession is conduct protected by the plain text of the Second Amendment, and the Government cannot show a historical tradition of categorically disarming felons.

### a. The Second Amendment's plain text covers the conduct prohibited by § 922(g)(1).

The Second Amendment protects "the right of the people to keep and bear Arms ...." U.S. Const. amend. II. The plain text, "keep and bear arms," means possessing and carrying weapons. *District of Columbia vs. Heller*, 554 U.S. 570, 583-92 (2008). The *Bruen* Court clarified that the core right to possess and carry a firearm for self-defense extends inside and outside the home. 142 S. Ct. at 2122.

§ 922(g)(1) is a complete ban on all firearm possession, with no limitations on type or use. The legislative history of § 922(g)(1) suggests that Congress acknowledged that § 922(g)(1) may conflict with the Second Amendment but wrongly concluded that the "right to bear arms" was not an individual right. *See, e.g.,* S. Rep. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2169; *see also Heller*, 554 U.S. at 628. Now, however, *Bruen* is conclusive that, "no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and

bear arms." *Bruen*, 142 S. Ct. at 2127. Because Sharkey's *conduct* in possessing a firearm is an individual right covered by the Second Amendment, it is presumptively protected.

**b. The Government cannot meet its burden that § 922(g)(1) is consistent with historical tradition of firearm regulation.**

Because the plain text of the Second Amendment covers § 922(g)(1), the burden shifts to the Government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. The *Bruen* Court summarized three metrics – temporal proximity to the founding era, similarity to the challenged restriction, and breadth – by which adequacy of historical tradition should be analyzed. *Id.* at 2130-34, 2136, 2138. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* at 2133 (citing *McDonald v. City of Chicago*, 561 U.S. 742, 767, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783)).

i. Historical regulation of the *conduct* of the bearer of the firearm.

Analyzing laws as far back as the Statute of Northampton, "one's *conduct* 'will come within the Act,'—i.e., would terrify the King's subjects—only 'where the crime shall appear to be malo animo,' 1 Comb., at 39, 90 Eng. Rep., at 330, with evil intent or malice." *Id.* at 2141 (emphasis added). And "Serjeant William Hawkins, in his widely read 1716 treatise, … noted that 'Persons of Quality' were 'in no Danger of Offending against this Statute [of Northampton] by wearing common Weapons' because, in those circumstances, it would be clear that they had no 'Intention to commit any Act of Violence or Disturbance of the Peace.' " *Id.* at 2142 (internal citations omitted). The same was true in colonial times when an individual would need to go "armed Offensively … in Fear or Affray" of the people in order to violate the law. *Id.* at 2143 (analyzing Colonial Massachusetts and New Hampshire regulations on the public carrying of

firearms); *see also* Collection of All Such Acts of the General Assembly of Virginia ch. 21, p. 33 (1794) (1786 Virginia statute required "in terror of the Country."); 1795 Mass. Acts and Laws ch. 2, p. 436, in Laws of the Commonwealth of Massachusetts (1795 Massachusetts statute required going "armed offensively, to the fear or terror of the good citizens of this Commonwealth."); 1801 Tenn. Acts pp. 260–261 (1801 Tennessee statute required an individual to "publicly ride or go armed to the terror of the people[.]"). All of these laws, as the *Bruen* Court concluded, "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Id.* at 2145. *Bruen* summarized how historical firearm restrictions prior to and around the Founding regulated *conduct*, not a subset of individuals.

> Those restrictions, for example, limited the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials. Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense. Nor, subject to a few late-in-time outliers, have American governments required law-abiding, responsible citizens to "demonstrate a special need for self-protection distinguishable from that of the general community" in order to carry arms in public. *Klenosky*, 75 App.Div., at 793, 428 N.Y.S.2d at 257.

*Id.* at 2156.

ii. No Founding-era historical tradition of regulating felons possessing firearms.

"[W]hen it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 2136 (quoting *Heller*, 554 U.S. at 634-35). Courts "are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *Heller*, 554 U.S. at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731, 51 S.Ct. 220, 75 L.Ed. 640 (1931);

*see also Gibbons v. Ogden*, 9 Wheat. 1, 188, 6 L.Ed. 23 (1824)). "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

"The 18th-century meaning [of Arms] is no different from the meaning today." *Heller*, 554 U.S. at 581. And "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Id.* at 584; *see also Muscarello v. United States*, 524 U.S. 125, 143, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998) ("Surely a most familiar meaning is, as the Constitution's Second Amendment ... indicate[s]: 'wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person.' ") (Ginsburg, J., dissenting). Additionally, crime and felons clearly existed during the Founding. Further, based on various States' proposals during ratification of the Second Amendment, so too existed the presumed "societal concern" addressed by § 922(g)(1) – felons possessing firearms. Commentary immediately following ratification illustrates the view that certain restrictions from the English Restoration were inconsistent with the right that was ultimately codified in the Second Amendment. *Heller*, 554 U.S. at 606-08. And while the New Hampshire, Massachusetts, and Pennsylvania ratifying conventions included proposals to limit the right to "peaceable citizens," or to expressly permit disarmament for those in "rebellion" or for "crimes committed," this language was not included in the Second Amendment itself. *See Kanter v. Barr*, 919 F.3d 437, 454-55 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 142 S. Ct. 2111. In other words, "Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons[,]" even when encouraged by some state conventions to do so. *Id.* at 451, 454 (Barrett, J., dissenting) (noting scholars have not been able to identify any founding-era laws disarming all felons); *see*

*also* Adam Winkler, Heller's Catch-22, 56 UCLA L. Rev. 1551, 1563 (2009) [hereinafter Winkler].

In fact, courts often have acknowledged the absence of Founding-era felony restrictions. Yet, they concluded that § 922(g)(1) was constitutional by relying on *Heller's* dicta that prohibitions on felon firearm possession were "longstanding," or by applying the now-abrogated means-end scrutiny test. *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011) (citing *Heller*, 554 U.S. 626-27, 627 n.16 (noting that the opinion does not cast doubt on longstanding prohibitions on firearm possession by certain individuals, including felons, which are presumptively lawful)); *Medina v. Whitaker*, 913 F.3d 152, 159-60 (D.C. Cir. 2019) (same); *see also United States v. Williams*, 616 F.3d 685, 691-94 (7th Cir. 2010) (holding § 922(g)(1) survives Second Amendment challenge under intermediate scrutiny). But there are no "longstanding" regulations disarming felons from the Founding-era.

iii. Unconstitutional modern-era dispossession of felons.

Congress did not pass the first version of the modern federal firearm ban for violent felons until 1938 and expanded it to include non-violent felons in 1961 and all felon possession in 1968, forever segregating felons out as a subset of "the people" not entitled to Second Amendment liberty. *See* Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed); Act of Oct. 3, 1961, Pub. L. No. 87-342, 75 Stat. 757 (repealed); Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213 (codified at 18 U.S.C. §§ 921-928); *see also* Winkler at 1563 ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment*, *Heller, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (similar); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1211 (2015) (similar). Yet, in *Heller*, the Court stated that "nothing in [its] opinion should

be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons[.]" *Heller*, 554 U.S. at 635. It described such prohibitions as "presumptively lawful regulatory measures." *Id.* at 627 n.26. Later, in *McDonald*, the Court "repeat[ed] [its] assurances" that felon dispossession laws remain valid. 561 U.S. at 786 (plurality opinion).

This post-Founding-era rational in stating that felon dispossession is a "presumptively lawful regulatory measure[]," however, does not harmonize with *Bruen's* "straightforward" historical inquiry. *Bruen*, 142 S.Ct. at 2131. And *Bruen* warned that "we must [] guard against giving postenactment history more weight than it can rightly bear." *Id.* at 2136. The Court further expressed skepticism about reliance on laws passed long after the passage of the particular Constitutional Amendment and explained, "to the extent later history contradicts what the text says, the text controls." *Id.* at 2137.

iv. Supreme Court dicta of "longstanding" and/or "law-abiding, responsible citizens" and/or "ordinary, law-abiding citizens" does not save § 922(g)(1).

It is clear that felons are part of "the people." In *Heller*, the Court explained that when the Constitution refers to "'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset," and that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." 554 U.S. at 580-81. And felons are not "categorically excluded from our national [American] community." *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting), *abrogated by Bruen*, 142 S.Ct. 2111. Their individual "right" to "bear arms" is, therefore, clearly constitutionally protected by the Second Amendment.

The counter argument of course is that felons are excluded from "the people" protected by the Constitution, because *Heller* and *Bruen* referenced "law-abiding" citizens in dicta. *Heller's* reference to "law-abiding, responsible" citizens, however, was meant to exclude from the Court's discussion groups whose disarmament the Founders "presumptively" tolerated or would have

tolerated. *See* 554 U.S. at 627, n.26 ("We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."). Other courts have piggy-backed on this rationale in upholding the constitutionality of § 922(g)(1). *See UNITED STATES OF AMERICA, Plaintiff, v. ROMEO WALTER, KENAN THOMAS, NIJOHNTEA WALKER, Defendants.*, No. 3:20-CR-0039, 2023 WL 3020321, at *2 (D.V.I. Apr. 20, 2023) (citing *See, e.g., United States v. Gleaves*, No. 3:22-CR-00014, 2023 WL 1791866, at *2 (M.D. Tenn. Feb. 6, 2023) ("[T]he Court agrees with the overwhelming consensus that *Bruen* is not an elixir for a federal firearm law violation committed by a felon."); *United States v. Isaac*, No. 522CR117LCBHNJ1, 2023 WL 1415597, at *5 (N.D. Ala. Jan. 31, 2023) ("*Bruen* did not disturb *Heller* but took great lengths to clarify it, and nothing in *Bruen* conflicts with the Eleventh Circuit's construction of *Heller* regarding § 922(g)(1)'s harmony with the Second Amendment."); *United States v. Brown*, No. CR 20-260-1, 2023 WL 424260, at *2 (E.D. Pa. Jan. 26, 2023) (noting that the Supreme Court's "Second Amendment jurisprudence does not extend to 18 U.S.C. § 922(g)" and finding that, "until the Supreme Court directs otherwise, Mr. Brown's facial challenge to § 922(g) fails"); *United States v. Garrett*, No. 18 CR 880, 2023 WL 157961, at *3 (N.D. Ill. Jan. 11, 2023) (noting "the controlling law of this circuit upholding the categorical felony firearms ban of § 922(g)"); *United States v. Coleman*, No. 3:22-CR-8-2, 2023 WL 122401, at *2 (N.D. W. Va. Jan. 6, 2023) ("the reach of *Bruen* ends at the feet of those individuals who are not law-abiding citizens"); *United States v. Reese*, No. 19-CR-257, 2022 WL 16796771, at *1 (W.D. Pa. Nov. 8, 2022) (finding "that Section 922(g) remains constitutional in light of *Heller* and *McDonald*, and *Bruen* does not alter that conclusion"); *United States v. Young*, No. CR 22-054, 2022 WL 16829260, at *7-8 (W.D. Pa. Nov. 7, 2022) (finding that "*Bruen, Heller* and *McDonald* dictate that Defendant's alleged conduct does not fall within the scope of the Second Amendment's protections due to his felony drug

convictions" and noting that, after *Bruen*, "virtually all of the district courts to have considered facial challenges to the constitutionality of 18 U.S.C. Sections 922(g), 923, and 924, have uniformly upheld their constitutionality"); *United States v. King*, No. 21-CR-255 (NSR), 2022 WL 5240928, at *5 (S.D.N.Y. Oct. 6, 2022) (finding that Section 922(g)(1) is constitutional and noting that "the *Bruen* majority opinion makes abundantly clear that *Heller* and *McDonald* stand as controlling precedents" and "repeatedly notes that the petitioners are 'law-abiding' citizens"); *United States v. Jackson*, No. CR 21-51 (DWF/TNL), 2022 WL 4226229, at *2 (D. Minn. Sept. 13, 2022) (denying facial challenge to Section 922(g)(1) and noting that, "[f]ollowing *Heller* and *McDonald*, the Eighth Circuit upheld the constitutionality of 18 U.S.C. § 992(g)(1) in *United States v. Seay*, 620 F.3d 919, 924 (8th Cir. 2010)," which "remains good law" after *Bruen*); *United States v. Cockerham*, No. 5:21-CR-6-DCB-FKB, 2022 WL 4229314, at *2 (S.D. Miss. Sept. 13, 2022) (finding that Section 922(g)(1) is not unconstitutional and noting that, after *Bruen*, "Federal courts nationwide have rejected similar facial constitutional challenges to the felon-in-possession statute."); *United States v. Ingram*, No. CR 0:18-557-MGL-3, 2022 WL 3691350, at *3 (D.S.C. Aug. 25, 2022) (finding that under *Heller* and *Bruen*, the Second Amendment does not protect possession of firearms by "non-law-abiding citizens").

On the other hand, many courts have used *Bruen* to strike down other provisions of § 922 because there was "no distinctly similar historical regulation addressing th[ose] problem[s][.]" *See Bruen*, 142 S.Ct. at 2131; *see e.g. United State v. Quiroz*, 2022 WL 4352482, *3, *5 (W.D. Tex. Sept. 19, 2022) (Second Amendment's plain text, protecting right to "keep and bear arms," covered defendant's conduct in receiving a firearm, and statute prohibiting persons under felony indictment from receiving a firearm is not consistent with Nation's historical tradition of firearm regulation, and thus, statute violates Second Amendment.); *United States v. Stambaugh*, 2022 WL 16936043,

at *6 (W.D. Okla. Nov. 14, 2022) (also holding section 922(n) unconstitutional); *see also United States v. Perez-Gallan*, 2022 WL 16858516, at *15 (W.D. Tex. Nov. 10, 2022) (holding section 922(g)(8) unconstitutional), appeal docketed, No. 22-51019 (5th Cir. Nov. 10, 2022); *United States v. Price*, 2022 WL 6968457, at *2-3 (S.D.W.Va. Oct. 12, 2022) (holding section 922(k) unconstitutional). The 5th Circuit Court of Appeals has also rejected the notion that someone under a domestic abuse protective order can be somehow segregated and subjugated as not "people" protected by the Second Amendment. *United States v. Rahimi*, 61 F.4th 443, 448 (5th Cir. 2023).

This conflict between *Bruen* and § 922(g) prohibitions is illustrated in decisions of the U.S. District Court for the Western District of Texas. On 9/19/2022, in *United States v. Quiroz*, Judge Counts held that § 922(n) – unlawful receipt of a firearm while under a felony indictment – was facially unconstitutional post-*Bruen*. He first decided that receiving a firearm is no different than possessing it – "[t]o receive something means 'to take into ... one's possession.'" *Quiroz*, 2022 WL 4352482 at *3 (quoting *Receive*, Oxford English Dictionary (3d ed. 2015)). Since Quiroz's "conduct" clearly fell under the Second Amendment's protection, the question was then "whether prohibiting persons under indictment from receiving a firearm is consistent with the Nation's historical tradition of firearm regulation." *Id.* at *4. Judge Counts then laid out how § 922(n)'s history tracked with the Federal Firearms Act of 1938 and its later forms that are discussed above. *Id.* at *4-*5. He noted that the Government's argument that § 922(n) is constitutional because it shares its history with § 922(g)(1)'s prohibition on the possession of firearms by felons and because of *Heller's* and *Bruen's* dicta was not persuasive because dicta is only "vapors and fumes of law," and his own analysis found no historical analogs to § 922(n). *Id.* at *5-*12. Indeed, "[a]s one historian wrote, after he searched all existing printed session laws of the first fourteen states year by year from 1607 to 1815, he couldn't find 'a single instance in which these jurisdictions

exercised a police power to prohibit gun ownership by members of the body politic.'" *Id.* at *6 (quoting Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 142 (2007)) [hereinafter Churchill]. "And even though other state courts eventually ruled on laws regulating the condition of a person, very few states prohibited felons—or any other type of person for that matter—from possessing a firearm." *Id.* at *7 (citing *e.g.*, *State v. Kerner*, 181 N.C. 574, 107 S.E. 222 (1921) (upholding ban on carrying a deadly weapon while intoxicated); *State v. Hogan*, 63 Ohio St. 202, 58 N.E. 572, 572, 575-76 (1900) (upholding a ban on carrying a firearm by "a tramp")). Finally, Judge Counts concluded:

> Whether this Nation has a history of disarming felons is arguably unclear—it certainly isn't clearly "longstanding." And what's even more unclear—and still unproven—is a historical justification for disarming those indicted, but not yet convicted, of any crime.

*Id.* at *7.

Yet, on 10/3/2022, in *United States v. Charles*, Judge Counts did a 180 and "held that national historical tradition excluded felons from term 'the people' within meaning of Second Amendment." No. MO:22-CR-00154-DC, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022). After repeating his historical analysis of § 922(g)(1)'s prohibition on the possession of firearms by felons, which arguably began in 1938 but was definitive by 1968 – nearly one hundred and fifty years or one hundred seventy years, depending on how one views the history, after the Second Amendment's ratification –, Judge Counts surprisingly relied on *Heller's* dicta "that there is a 'longstanding' prohibition on felons possessing firearms." *Id.* at *3 (citing *Heller*, 554 U.S. at 626). But he also admitted that Justice Scalia, author of *Heller*, never elaborated on what he meant by "longstanding." *Id.* Judge Counts then relied on historical evidence from the New Hampshire, Massachusetts, and Pennsylvania ratifying conventions, which were discussed earlier, where these

States arguably wanted to bar convicted criminals from Second Amendment protection. *Id.* at *4. But Judge Counts then dodged the glaring fact that this language never became part of the text of the Second Amendment to move into a more nuanced approach under *Bruen* to find that it was a "relatively similar" historical analogue to § 922(g)(1). *Id.* Thereafter, Judge Counts noted that the "tension" between how certain Amendments define "the people" versus how the Second Amendment defines "the people" "has created an ongoing debate, but this Court does not wade into that debate." *Id.* at *6. Finally, in upholding the constitutionality of § 922(g)(1), Judge Counts found that "the people['s]" rights have historically been abridged in other contexts, i.e. the right to vote, the right to assemble, and the right to speech. *Id.* at *7.

However, these analogies are misplaced. First, Judge Counts admittedly could not find any law from the time of the Founding or ratification prohibiting any subset of "the people," let alone specifically felons, from possessing firearms. His analysis under *Bruen* should have stopped there because felons possessing firearms does not "implicat[e] unprecedented societal concerns or dramatic technological changes [that] may require a more nuanced approach." *Bruen*, 142 S.Ct. at 2132. The Government, who bore the burden of proof, therefore, could not rely on "analogical reasoning" using "relevantly similar" analogues. *Id.* The "relevantly similar" inquiry is reserved for statutes addressing uniquely modern problems that would have been "unimaginable" at the Founding. *Id.* Second, even under his nuanced approach, when the freedoms of assembly and speech are constitutionally abridged, it is due to the contemporaneous *conduct* of the actor, not based on his or her prior status as a felon or criminal or any other subset of "the people." Indeed, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000); *see also Philadelphia Newspapers, Inc. v. Hepps*,

475 U.S. 767, 777, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). In some cases, that burden includes showing whether the expressive conduct falls outside of the category of protected speech. *See Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 620, n. 9, 123 S.Ct. 1829, 155 L.Ed.2d 793 (2003). And to carry that burden, the government must generally point to *historical evidence* about the reach of the First Amendment's protections. *See, e.g., United States v. Stevens,* 559 U.S. 460, 468–471, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (placing the burden on the government to show that a type of speech belongs to a "historic and traditional categor[y]" of constitutionally unprotected speech "long familiar to the bar" (internal quotation marks omitted)). So, some speech is not protected because it causes immediate danger – yelling "fire!" in a crowded theater –, but the person, whether a felon or not, is not barred from first amendment protection prior to yelling "fire!".

Other nuanced analogies where felons' liberties are legally restricted in other instances, such as their rights to vote and to serve on a jury, should similarly be rejected. Whereas the Fifteenth Amendment to the United States Constitution bars disenfranchisement based on "race, color, or previous condition of servitude," it is state laws that bar a felon's right to vote. Same goes for a felon's right to sit on a jury.

The undersigned would additionally argue that the Court's terminology in *Bruen* – "ordinary, law-abiding citizens" – is, in fact, a prelude to the Court returning to the Founding-era historical tradition of regulating *conduct* and not the bearer. This regulation of contemporaneous conduct while possessing a firearm and not the individual also pairs neatly with modern firearm regulations. Going armed with intent, possession of a firearm during a drug transaction, assault with a dangerous weapon all regulate the *conduct* of the individual *while possessing a firearm*, not the particular "subset" status of the individual. And these modern analogues further fit well with

similar founding-era historical regulations as described above, where the conduct was regulated, not the "bearer" of the "arm."

Indeed, *Bruen* genuinely indicated disdain for post Second Amendment ratification laws that attempted to thwart the right of certain subsets of "people to keep and bear arms." *Id.* at 2151 ("After the Civil War, of course, the exercise of this fundamental right by freed slaves was systematically thwarted. This Court has already recounted some of the Southern abuses violating blacks' right to keep and bear arms.") (citing *McDonald*, 561 U.S. at 771, 130 S.Ct. 3020 (noting the "systematic efforts" made to disarm blacks); *id.*, at 845–847, 130 S.Ct. 3020 (THOMAS, J., concurring in part and concurring in judgment); *see also* S. Exec. Doc. No. 43, 39th Cong., 1st Sess., 8 (1866) ("Pistols, old muskets, and shotguns were taken away from [freed slaves] as such weapons would be wrested from the hands of lunatics")). Asserting a blanket disarmament of freed slaves because they were perceived as "lunatics," a status for which they could never rehabilitate, is analogous to disarming felons for life, simply because the government labels them a felon. And it should also surprise no one that African American males, like Sharkey, are disproportionately labeled as felons in the United States. *See* https://www.sciencedirect.com/science/article/abs/pii/ (last visited 4/22/2023) ("[W]hile the share of the total U.S. adult population with felony records is about 8 percent, the share of Black adults is about 23 percent. This rate is even higher for Black men, where one-third (33 percent) have a felony record (Shannon et al., 2017)[.]").

Further, Eighth Circuit Second Amendment precedent analysis under the standard set forth in *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) for evaluating a statute's facial constitutionality under the Second Amendment should also now be questioned. *See United States v. Hammond*, No. 422CR00177SHLHCA, 2023 WL 2319321, at *2

(S.D. Iowa Feb. 15, 2023). This is because, as was demonstrated in *United States v. Bena*, 664 F.3d 1180 (8th Cir. 2011), the Eighth Circuit is concluding that there was a Founding era "common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible." *Id.* (citing *Bena*, 664 F.3d at 1183; *see also United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) ("That some categorical limits [on firearm possession] are proper is part of the original meaning [of the Second Amendment], leaving to the people's elected representatives the filling in of details.")). This analysis respectfully fails for the same reason Judge Counts' fails – there was not "a single instance in which [jurisdictions of the Founding era] exercised a police power to prohibit gun ownership by members of the body politic." Churchill, 25 L. & Hist. Rev. at 142. Since crime and felons were certainly known to the Founders, as too was the idea of bearing arms, and the Founders specifically rejected barring convicted criminals, or even those in rebellion, from Second Amendment Protection, under *Bruen*, a court cannot now act as if the Founders would have presumably tolerated such disarmament. In other words, this is not a situation "implicating unprecedented societal concerns or dramatic technological changes [that] may require a more nuanced approach[.]" *Bruen*, 142 S. Ct. at 2132. Therefore, the historical analysis is straightforward and not susceptible to the nuanced approach.

Finally, the correct analysis for § 922(g)(1) should end once it is clear that there are no Founding-era laws that prohibited firearm possession by felons. And, indeed, the undersigned cannot find a court decision that has upheld § 922(g)(1) because of a "similar historical regulation" during and around the Founding that disarmed all felons based solely on their status as felons. Further, as stated above, there does not appear to be a "longstanding" Founding-era regulation. Therefore, the disarming of felons is solely based on the idea that they are not "law-abiding." This does not harmonize with *Bruen's* framework. *Bruen*, 142 S.Ct. at 2126. In fact, allowing a

regulation to stand in the face of its unconstitutionality simply because the Founders "presumptively" would have tolerated it, when history shows *they did not*, is arguably indistinguishable from allowing a regulation which infringes upon the Second Amendment simply because it is a laudable policy goal.

The point being that the Second Amendment right to bear arms is not a second-class right. *Id.* at 2156. Where a regulation confronts a longstanding "perceived societal problem" that the Founders could have addressed but either did not address or addressed through "materially different means," the regulation is unconstitutional. *Id.* at 2131. To allow § 922(g)(1) to regulate felons as a subset for Second Amendment analysis would be regurgitating "judicial deference to legislative interest balancing" in the form of means-end scrutiny in Second Amendment jurisprudence, which *Bruen* has undeniably rejected. *Id.* at 2131. In conclusion, § 922(g)(1) is unconstitutional on its face.

**III. 18 U.S.C. § 922(k) is facially unconstitutional because firearm possession is conduct protected by the plain text of the Second Amendment, and the Government cannot show a historical tradition of categorically regulating possession of firearms with obliterated serial numbers.**

The Second Amendment's plain text does not distinguish between bearing arms that have manufacturer's serial numbers and those which do not, and a prohibition and even criminalization of possessing a firearm with the manufacturer's serial number removed presumptively violates the Second Amendment. § 922(k) states, in pertinent part,

> It shall be unlawful for any person knowingly to transport ... in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess ... any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.

*Price*, No. 2:22-CR-00097, 2022 WL 6968457, at *2 (quoting 18 U.S.C. § 922(k)). This is not a "commercial regulation that requires manufacturers to place serial numbers on firearms[.]" *Id.* at

*3; *see also* 18 U.S.C. § 923(i); *cf. Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). § 922(k) "criminalizes the mere possession of a firearm after a serial number is removed, obliterated, or altered in any way, whether or not the firearm is then placed into commerce." *Price*, No. 2:22-CR-00097, 2022 WL 6968457, at *3. Possession of a firearm is conduct clearly covered by the plain text of the Second Amendment and therefore, is presumptively protected.

Further, the Government cannot show that § 922(k) "is consistent with the Nation's historical tradition of firearm regulation[]" at the time of the Founding and ratification of the Second Amendment in 1791. *Bruen*, 142 S. Ct. at 2130. Branding firearms with serial numbers is a concept that post-dates the Founding and ratification. They "arose only with the advent of the mass production of firearms." *Price*, No. 2:22-CR-00097, 2022 WL 6968457, at *5 (citing Thomas Henshaw, *The History of Winchester Firearms 1866–1992* ix (6th ed. 1993) (listing the first recorded serial number on a Winchester firearm as appearing in 1866); National Park Service, *Firearm Serial Numbers*, https://www.nps.gov/spar/learn/historyculture/firearm-serial-numbers.htm (last visited Oct. 11, 2022) (stating that no serial numbers appeared on Springfield Armory weapons until 1865)). "The first precursor to § 922(k) appeared in the Federal Firearms Act of 1938 and made it unlawful 'for any person to transport, ship, or knowingly receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered.'" *Id.* at *5 (citing Pub. L. No. 75-785, § 2(i), 52 Stat. 1250, 1251 (1938)). Then, "[s]erial numbers were not broadly required for all firearms manufactured and imported in the United States until the passage of the Gun Control Act of 1968." *Id.* (citing Pub. L. 90-351, § 902, 82 Stat. 197, 232 (1968) ("Licensed importers and licensed manufacturers shall identify ... each firearm imported or manufactured.")). "Even in 1968[, however,] there was no prohibition on mere possession of a firearm that had the serial number altered or removed. In fact,

it was not until the Crime Control Act of 1990 that Section 922 was amended to insert 'or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.'" *Id.* (citing Pub. L. No. 101-647, § 2202(b), 104 Stat. 4789, 4856 (1990)). Congress' intent in adding mere "possession" of a firearm with an obliterated serial number was to "broaden [the Bureau of Alcohol, Tobacco, and Firearm's] jurisdiction to attack the black market in firearms by redefining the interstate nexus as it relates to stolen firearms and firearms with obliterated serial numbers." *Id.* (citing *Comprehensive Violent Crime Control Act of 1989: Hearing on H.R. 2709 Before the Subcomm. on Crime of the H. Comm. on the Judiciary*, 101st Cong., 2d Sess. 143 (Mar. 6, 1990)). Since § 922(k) was passed to address "crime, including crime involving stolen firearms, and assisting law enforcement in solving crime," which were all obvious "societal problems[s]" during and around the Founding and ratification of the Second Amendment, and since the Founders did not regulate possession of firearms without serial numbers, then § 922(k) is facially unconstitutional under *Bruen*. *See id.*

**IV. Count 1 of the indictment is unconstitutional as applied to Sharkey.**

Now Justice Barrett dissented to an as-applied challenge to § 922(g)(1) in *Kanter*. *Hammond*, No. 422CR00177SHLHCA, 2023 WL 2319321, at *3 (citing *Kanter*, 919 F.3d at 451, *abrogated by Bruen*, 142 S. Ct. 2111 (2022) (Barrett, J., dissenting)). She concluded that "§ 922(g)(1) is overbroad because 'its application is not limited to those who have committed violent crimes.'" *Id.* (citing *Kanter*, 919 F.3d at 466 (Barrett, J., dissenting)). She based this dissent on what she considered a historical tradition of the state taking "the right to bear arms away from a category of people it deems dangerous." *Id.* (citing *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting)).

Sharkey has only one prior criminal conviction that arguably could be considered a "crime of violence" under federal sentencing guidelines – involuntary manslaughter in violation of Iowa Code § 707.5(1) (2012). U.S.S.G. § 4B1.2(a) defines the term "crime of violence" as any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c). Sharkey's conviction was for *involuntary* manslaughter. So, in order to satisfy § 4B1.2(a), it must "categorically" require an offender to use force, attempt to use force, or threaten to use force against the person of another. *United States v. Jones*, 38 F.4th 727, 729 (8th Cir. 2022). Iowa Code § 707.5(1) requires that a "person unintentionally causes the death of another person by the commission of a public offense other than a forcible felony or escape." Nothing within its definition makes Iowa Code § 707.5(1) categorically a crime of violence under U.S.S.G. § 4B1.2(a). This is likely why Sharkey's base line offense remained at 20 in his previous PSI, and not 22. Further, Count 1 arises from Sharkey possessing a handgun inside his home and in his backyard, conduct protected by the Second Amendment. Therefore, § 922(g)(1), as applied to Sharkey, is unconstitutional.

## CONCLUSION

**WHEREFORE,** the Defendant, Dontavius Sharkey, prays that this Court dismiss Counts 1 and 3 of the indictment for the reasons stated herein.

**CAUSEY & YE LAW, P.L.L.C.**

/s/Jonathan M. Causey

Jonathan M. Causey AT0012248
2213 Grand Avenue

Des Moines, IA 50312
(p) 515-381-0168
(f) 515-214-1434
(e) Jon@CauseyYeLawGroup.com
**CJA COUNSEL FOR DEFENDANT**

Filed CM/ECF

**NOTICE OF ELECTRONIC FILING**

Notice of Electronic Filing is sent through the CM/ECF electronic document management system to all registered filers for the above-mentioned matter. A review of the filers in this matter indicates all necessary parties have been or will be served. Any unregistered filer will be served with a written copy and so noted in a Certificate of Service.

By: /s/ Jonathan M. Causey__
Jonathan M. Causey

Date: April 25, 2023.